UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CHRISTOPHER ANDERSON and JAMES "J.J." HATMAKER, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 3:19-CV-096 |
| CITY OF JELLICO, TN, | ) ) ) |
| Defendant. | ) ) |

# **MEMORANDUM OPINION**

This matter is before the Court on Defendant's motion for summary judgment [Doc. 24]. Plaintiffs have responded [Doc. 30], and Defendant has replied [Doc. 33]. Oral argument is not necessary, and this matter is now ripe for review. For the reasons stated below, Defendant's motion for summary judgment [Doc. 24] will be **GRANTED**, and this action will be **DISMISSED**.

**I.    BACKGROUND**

Plaintiff Christopher Anderson, former Chief of Police for Defendant City of Jellico ("Defendant") and Plaintiff J.J. Hatmaker, former Assistant Police Chief for Defendant filed suit against the City of Jellico, alleging that they were fired in retaliation for making statements regarding illegal activity by the Mayor at a City Council meeting on January 17, 2019. [Doc. 22].

**A.  Factual Findings**

The facts of this case are largely undisputed by the parties, with a few exceptions. Both Parties agree that Plaintiff Anderson was the City of Jellico Chief of Police as of December 2007, and Plaintiff Hatmaker was the Assistant Police Chief as of February 2010. Both parties agree that Dwight Osborn ("Mayor Osborn") was elected City of Jellico Mayor in November 2018 and took office on December 18, 2018. In the same election, four new Board of Aldermen members were also elected – Sandy Terry, Suzette Davenport, Jerry Neal and Stanley Marlow. Mayor Osborn appointed Sandy Terry, Jerry Neal and Alvin Evans to the Police and Fire Committee, which had been inactive for several years prior. Mayor Osborn called a meeting with the Jellico Police Department on December 21, 2018, and discussed the use of profane language by officers, patrol cars, uniforms, crime downtown, the homeless population issue in Jellico, scheduling, and patrolling.

In December 2018, the City of Jellico Police Department was over budget. The Mayor and Board have oversight authority on matters that concern the City's budget per the City's Charter, but the Parties dispute whether the Mayor has authority to set a schedule for the police department, or whether that duty lies solely with the Chief of Police per the Police Policy Resolution. After that meeting, Mayor Osborn provided Plaintiff Anderson with a schedule. There is a dispute as to whether this schedule was meant to be a sample schedule or whether the schedule was supposed to be implemented exactly as Mayor Osborn had made it. According to their Amended Complaint, Plaintiffs recognized multiple threats to the public's safety brought about by the Mayor's discussion at the department meeting, including only having one officer on duty during the day when schools were in

session and businesses were open and violating homeless citizens' constitutional rights by targeting these individuals for arrest, with or without probable cause to do so.

On January 17, 2019, a regularly scheduled city council meeting was held. Plaintiffs attended the meeting in their police uniforms, but they were off duty. Plaintiffs did not ask to be put on the agenda of the meeting and did not address the council during the designated "grievances from citizens" portion towards the beginning of the meeting. Plaintiffs began to speak during the portion of the meeting addressing the potential hiring of a new police officer. Mayor Osborn initially objected to Plaintiffs addressing the Board as they had not been properly recognized under the Rules of Order. After a proper motion to suspend the Rules of Order was made and passed by the Board, Plaintiffs were then appropriately allowed to speak. Plaintiffs discussed how the Police Chief had no input in the deciding to hire a full-time officer, a full-time dispatcher, and a part-time dispatcher; how scheduling had always been set by the Police Chief and that Mayor Osborn had instituted a schedule at a previous meeting; how the City Charter and the Ordinances and Policies and Procedures of the Police Department work together; and how the current schedule, as set by the Mayor, left only one person working the day shift when most business and schools were open. Chief Anderson also asked several times to be terminated right then and there at the meeting. Both Parties agree that Plaintiff Hatmaker used profanity and took the Lord's name in vain during the meeting. Several times, Mayor Osborn instructed Plaintiffs to sit down or stop talking, but Plaintiffs refused to do so.

On January 24, 2019, Mayor Osborn issued a Notice of Suspension of Employment letter to each Plaintiff. (Ex. 5, 6 to Osborn Depo.) Plaintiff Anderson's Notice stated that

3

he was being suspended for the following violations and actions which occurred on January 17, 2019:

> 1) Disturbance of a meeting (TCA 39-17-306);
>
> 2) Failure to perform duty (TCA 38-3-111) (failing to prevent a disturbance during the city council meeting);
>
> 3) Failure to follow the chain of command (Jellico Municipal Code 1-401) Police and Fire Committee;
>
> 4) Violation of General Regulations and Rules of Conduct (Jellico Municipal Code 1-403) (officers are to be courteous and obliging);
>
> 5) Conduct embarrassing to the City of the Jellico Police Department (Manual of Rules, Policies and Procedures of the City of Jellico Police Department, Standard of Conduct); and
>
> 6) Failure to follow directives (administrative regulations) of Mayor (Jellico City Charter 3.01)

Plaintiff Hatmaker's Notice cites the same violations, with one addition: Use of profanity (Jellico Municipal Code 1-403) – (Plaintiff Hatmaker used the phrase, "the damn mayor" and took the Lord's name in vain while he was speaking at the meeting). Plaintiffs argue that they were not fired for their actions as listed in the suspension notices, but were fired for the substance of their statements at the City Council meeting. Plaintiffs argue that this creates a genuine dispute of fact about why Plaintiffs were suspended and ultimately terminated.

The Suspension Notices also informed Plaintiffs of their opportunity to respond and to request a hearing before the Police and Fire Committee. There is debate as to whether this was a legal disciplinary/appeal procedure or whether Plaintiffs could only be terminated by the board of alderman. Plaintiffs requested a hearing before the Police and Fire Committee which was held on February 11, 2019. At the hearing, Plaintiffs were given the opportunity to participate, present evidence and respond fully to the allegations. Plaintiffs were not represented by counsel. Ultimately, the Police and Fire Committee voted 2-1 to terminate Plaintiffs' employment with the City. There is a dispute as to whether Plaintiffs could have appealed the decision of the Police and Fire Committee to a vote of the full Board. However, Plaintiffs were at least informed of this option by Alderman Evans at the conclusion of the Police and Committee meeting. Neither Plaintiff filed an appeal of the Committee's termination decision.

**B.  Procedural History**

On March 21, 2019, Plaintiffs filed a Complaint against Defendant. [Doc. 1] On November 17, 2020, Plaintiffs filed an Amended Complaint alleging violations of 42 U.S.C. § 1983 of the First and Fourteenth Amendments (Count 1), violations of the First Amendment (Count 2), Deliberate Indifference as to Plaintiffs' First and Fourteenth Amendment Rights (Count 3), Failure to Train its new employees which caused the deprivation of Plaintiffs' constitutional rights (Count 4), violations of the Tennessee Public Protection Act ("TPPA") (Count 5), and violations of the Public Employee Political Freedom Act ("PEPFA") (Count 6). [Doc. 22]. Defendant filed an Answer on December

1, 2020. [Doc. 23]. On February 24, 2021, Defendant filed the instant motion for summary judgment. [Doc. 24]. Defendant contends that:

1) Plaintiffs do not have property interests in continuing to work as Tennessee is an at-will employment state, and Plaintiffs were not deprived of due process as they were notified of the charges against them, given an explanation of the City's position, and given an opportunity to present their side at an evidentiary hearing before the Police and Fire Committee;

2) Plaintiffs' speech was not protected speech under the First Amendment because they were speaking, in uniform, as employees about the daily operation of the police department at the City Council meeting, that Plaintiffs' conduct at the City Council meeting brought the professionalism of the police department into disrepute and undermined the public's confidence in local law enforcement, and that Plaintiffs were not terminated due to the content of their speech but their actions at the City Council meeting and their use of profanity;

3) Plaintiff's cannot prove *Monell* liability as they cannot prove an underlying constitutional act;

4) Plaintiffs' TPPA claims fail as a matter of law as they cannot establish that Mayor Osborn's conduct violated any law or constitutes illegal activity as defined by the TPPA, and they have not proven that they were terminated solely because of their alleged whistleblowing; and

6

5) Plaintiffs' PEPFA claim fails as a matter of law as Plaintiffs have not established that they were terminated for communicating with an elected public official. [Doc. 25].

Plaintiffs respond that:

1) Defendant relies on superseded version of state law negating its due process arguments and Plaintiffs had a protectible property interest in continued employment for which they were denied due process;

2) Plaintiffs were speaking as private citizens, their speech related to matters of public concern, that Defendant's interests do not outweigh Plaintiffs' First Amendment rights, and that there are factual disputes regarding Defendant's arguments as to causal connect between Plaintiffs' words and their termination;

3) Plaintiffs have established several of the non-exclusive paths for imposing *Monell* liability including ratification of illegal actions, inadequate training or supervision, and deliberate indifference as to the violation of federal rights;

4) Plaintiffs had a reasonable cause to believe a law, regulation, or rule had been violated or will be violated and in good faith reported it and have shown that there is a factual dispute as to whether Plaintiffs were fired for their actions or their speech; and

> 5) Defendant cannot carry its burden as to summary judgment on the PEPFA claim as punishing Plaintiffs for taking their grievances to the board is *ipso facto* a PEPFA violation. [Doc. 30].

Defendant replies that it does not rely on superseded version of state law as no Act has ever repealed or replaced the Jellico Municipal Code, and the City has long operated with a co-existing Charter and Municipal Code, along with resolutions like the Policies and Procedures governing each department; that Plaintiffs have not proved that a contract governed their terms of employment and equate being dismissed for cause to being dismissed only by vote of the Board of Mayor and Aldermen; that Plaintiffs were given due process; that there was no underlying constitutional violation of Plaintiffs' First Amendment rights; and that Summary Judgment should be granted as to *Monell* liability, Plaintiffs' TPPA claim, and Plaintiffs' PEPFA claim. [Doc. 33].

## II. ANALYSIS

Defendants' motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion[.]" Fed. R. Civ. P. 56(c)(1). This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Additionally, a party may "show[] that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Moreover, mere conclusory and unsupported allegations, rooted in speculation, are insufficient to meet this burden. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id*. at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id*. at 251-52.

### A. Due Process and Property Interest (Count 1)

Plaintiffs bring a claim pursuant to 42 U.S.C. § 1983 against Defendant for violating their due process rights. Generally, under § 1983 a municipality is liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Bennett v. City of Eastpointe,* 410 F.3d 810, 818–19 (6th Cir. 2005)

(quoting *Monell,* 436 U.S. at 694). Normally, then, cities are not held accountable for the actions of their agents under § 1983. However, when an allegedly unconstitutional decision is made by an official with final policy making authority, the municipality may be held liable for that official's decision. *Arendale v. City of Memphis,* 519 F.3d 587, 601 (6th Cir. 2008).

To assert a valid cause of action under § 1983, a plaintiff must show that "1) [the plaintiff] was deprived of a right secured by the Constitution or laws of the United States and that 2) the deprivation was caused by someone acting under color of state law." *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003) (quotations omitted). Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Flint v. Ky. Dept. of Corr.,* 270 F.3d 340 (6th Cir. 2001) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808 (1985)). As to the question of whether Plaintiffs have been deprived of a constitutional right, under the Due Process Clause of the Fourteenth Amendment, "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing." *Bd. of Regents v. Roth,* 408 U.S. 564, 570 n. 7 (1972). To establish a procedural due process claim, a plaintiff must show the following: 1) that he had a life, liberty, or property interest protected by the Due Process Clause; 2) that he was deprived of this protected interest; and 3) he was not afforded adequate procedural rights prior to the deprivation. *Albrecht v. Treon,* 617 F.3d 890, 894 (6th Cir. 2010). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Id.* at 569.

In the public employment context, to establish a claim for deprivation of property, a plaintiff "must establish that [he] had a property interest in continued employment with the city." *Brown v. City of Niota,* 214 F.3d 718, 720 (6th Cir. 2000). Whether a property interest exists is not determined by reference to the Constitution; rather, property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Id.* at 721 (quoting *Ludwig v. Bd. of Trustees,* 123 F.3d 404, 409 (6th Cir. 1997)). Such independent sources can include state statutes, contractual guarantees, or even agreements "implied from the defendants' words and conduct in light of the surrounding circumstances." *Woolsey v. Hunt,* 932 F.2d 555, 564 (6th Cir.1991). Without such an agreement, a plaintiff's claim turns "on whether anything in Tennessee statute, common law, or regulation creates [a property] interest" in his continued employment. *Aldridge v. City of Memphis,* 404 Fed. App'x. 29, 35 (6th Cir. 2010). It is the plaintiff's burden to establish a property interest. *Pucci v. Nineteenth Dist. Ct.,* 628 F.3d 752, 766 (6th Cir. 2010).

As a starting point, "Tennessee has long recognized the doctrine of employment at will, with the mutual right of either party to terminate such relationship with or without cause." *Brown,* 214 F.3d at 721. Plaintiffs do not contest that their employment was "at will." Rather, Plaintiffs contend that they had a property interest in employment "insofar as an angry mayor and his created committee could not fire them." [Doc. 30, p. 25].

Here, section 3.07 of the Jellico City Charter states, "all employees are employees at will, including the chief of police and fire chief." [Doc. 30, Ex. 9]. Ordinance No. 91-

11

2011, City of Jellico Personnel Policies states in Section 1.02, "The City of Jellico, Tennessee is an at-will employer. Nothing in this document may be construed as creating a property right or contractual right to any job for any employee" and in section 3.07, it reiterates, "*REMINDER* THE CITY OF JELLICO IS AN AT-WILL EMPLOYER. THE CITY RESERVES THE RIGHT TO TERMINATE AN EMPLOYEE'S EMPLOYMENT AT ANYTIME WITH OR WITHOUT CAUSE. THE CITY RESERVES THE RIGHT TO DISCIPLINE AN EMPLOYEE UP TO AND INCLUDING TERMINATION OF EMPLOYMENT." [Doc. 30, Ex. 10]. Further, the Police Policy Resolution states in section 2.09(B), "Charges resulting in disciplinary action may be made against members of this department for the commission of any prohibited act as stated in part A above. Discipline as provided here does not change the "at will" status of employees of the department," and in section 2.10(E), "An employee *may* be dismissed by the Board of Mayor and Aldermen at any time, with or without cause." [Doc. 30, Ex. 15] (emphasis added). *Cf. Brown,* 214 F.3d at 721 (noting that employee rules and regulations could modify an employment relationship from at-will, but only when there was unequivocal language showing intent to do so).

These rules and ordinances use the term "may" when referencing employment termination. The term "may" is permissive and suggests that there are other permissible means for terminating a city employee. In cases where Tennessee courts have found an employment contract to exist, the employee handbook contained the mandatory terms "shall" and "will." *See, e.g.*, *Williams v. Maremont Corp.,* 776 S.W.2d 78, 80–81 (Tenn. Ct. App. 1988) (finding the language "employees *will* be recalled in the order of seniority"

12

to be binding) (emphasis added); *Hamby v. Genesco, Inc.,* 627 S.W.2d 373, 376 (Tenn. Ct. App. 1981) (holding that the statement contained in the employee handbook that "these *shall* be The Guaranteed Policies, Practices and Procedures" created a contractual relationship) (emphasis added). In *Ogburn v. Gas and Water Dep't,* No. 01A01–9702–CH–00056, 1997 WL 528812, at *4–5 (Tenn. Ct. App. Aug. 27, 1997) (unpublished), the court held that the use of "may" in the city charter did not limit the city from following other methods to terminate employees. Accordingly, the Court finds that the language of the City Charter, the Personnel Policies Ordinance, and the Police Policy Resolution does not evidence the clear intent to create a property interest in continued employment with the city.

Similarly, Plaintiffs have not pointed to any language in the personnel policy or other document stating anything specific about the duration of the employment contract. *See id.* at 722 (citing *Bringle v. Methodist Hosp.,* 701 S.W.2d 622, 625 (Tenn. Ct. App. 1985)) (noting that a contract for an indefinite term is a contract at will). Plaintiff has not shown that there was "an independent source" to create an expectation of employment as required for a viable due process claim. *Brown,* 214 F.3d at 721. Accordingly, Defendant's motion for summary judgment as to Plaintiffs' Due Process claim, Count 1, will be **GRANTED**.

### B. First Amendment Retaliation Claim (Count 2)

To establish a prima facie First Amendment retaliation case, Plaintiffs must demonstrate that: (1) the employee was engaged in constitutionally protected speech; (2) the employee was subjected to an adverse employment action that would deter a person of

13

ordinary firmness from continuing to engage in that speech or conduct; and (3) the protected speech was a substantial or motivating factor for the adverse employment action. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

To determine whether Plaintiff's speech is subject to First Amendment protection, the threshold inquiry is whether the speech addressed a matter of public concern based on its content, form, and context of a given statement as revealed by the whole record. *Rankin v. McPherson,* 483 U.S. 378, 384 (1987); *Dambrot v. Cent. Mich. Univ.,* 55 F.3d 1177, 1186 (6th Cir. 1995); *see also Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Matters of public concern include speech that "relat[es] to any matter of political, social, or other concern to the community." *Id*. at 146. We must determine whether the relevant speech "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 898 (6th Cir. 2001) (internal quotations omitted). Thus, speech falling into this category includes informing the public that a governmental entity failed to "discharg[e] its governmental responsibilities" or "bring[ing] to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein]." *Connick,* 461 U.S. at 148.

The Supreme Court has emphasized that the employee must be speaking as a citizen, not as an employee for personal interest purposes. *Id*. at 146–47. "Internal personnel disputes or complaints about an employer's performance" do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech. *Brandenburg,* 253 F.3d at 898; *see also Jackson v. Leighton,* 168 F.3d 903, 910–

11 (6th Cir. 1999). Additionally, in distinguishing between matters of public and private concern, the focus is not on "what might incidentally be conveyed by the fact that the employee spoke in a certain way, [but] the *point* of the speech in question." *Dambrot,* 55 F.3d at 1187 (internal quotations omitted). "Controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Id.* However, the employee's entire speech does not have to focus on matters of public concern, so long as some portion of the speech does. *Rahn v. Drake Ctr., Inc.,* 31 F.3d 407, 412 (6th Cir. 1994) (citing *Connick,* 461 U.S. at 146–49).

In analyzing whether an employee's speech touches upon a matter of public concern, the Sixth Circuit has consistently observed the dichotomy *Connick* presented: speaking as a *citizen* (albeit in the employee role) versus speaking as an employee *for personal interest.* As *Connick* emphasized, the focus of the speech is on the point of the speech as opposed to the role of the speaker in saying it. *See* 461 U.S. at 148–49. Specifically, Courts consider (1) the point or focus of the speech in question and (2) whether the point "relat[es] to any matter of political, social, or other concern to the community." *Id.* at 146 (internal citations omitted). "[T]he pertinent question is not *why* the employee spoke, but *what* he said...." *Farhat v. Jopke,* 370 F.3d 580, 591 (6th Cir. 2004) (emphasis in original). Courts are concerned with the distinction between matters of public concern and those only of private interest, "not [between] civic-minded motives and self-serving motives." *Chappel v. Montgomery Cnty. Fire Protection,* 131 F.3d 564, 575 (6th Cir. 1997). Matters of public concern are those that may be "fairly characterize[d] ... as relating to any matter of political, social, or other concern to the community." *Rahn,* 31 F.3d at 412. Speech on such matters

is protected because the First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information. *See Connick,* 461 U.S. at 145, 149; *Pickering v. Board of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 571–72 (1968). When the government acts as an employer, it has broader authority to regulate the speech of its employees than it does to regulate the speech of citizens. *Garcetti v. Ceballos,* 547 U.S. 410, 411 (2006). However, a public employee does not surrender his First Amendment rights as a condition of employment. *Connick,* 461 U.S. at 142. A public employee retains his right as a citizen to speak on matters of public concern. As such, to qualify as protected speech, Plaintiffs must have spoken in their capacity as citizens rather than in their capacities as Police Chief and Assistant Police Chief. *Pickering*, 391 U.S. 563 at 574. However, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

Here, Plaintiffs spoke, in uniform, during a section of the city council meeting discussing the potential hiring of a new police officer. Plaintiffs specifically chose not to speak during the portion of the meeting open to the general public. Plaintiffs' spoke about the interaction between the City Charter and the Jellico Municipal Code and specifically the delegation of authority between the Police Chief, the Mayor, and the Police and Fire Committee and how the City Charter and the Police Department policy and procedural manual interact. [Doc. 30, Ex. 13, pp. 6-11]. Plaintiffs then discussed the schedule the

16

Mayor implemented and asserted that the new schedule was putting the public at risk and endangering the lives of everyone and their family. [*Id*. at 14-15].

The Court finds that the focus of Plaintiffs' speech was not on exposing public endangerment or corruption within the Mayor's office but was rather focused on discontent with new policies put in place which *might* lead to public endangerment. While Plaintiffs assert that Mayor Osborn was attempting to violate homeless persons' Fourth and Fourteenth Amendment rights in their response brief [Doc. 30, p. 2], Plaintiffs made no mention of this during the City Council Meeting in question. [*See* Doc. 30, Ex. 13]. Plaintiffs' speech was nothing more than an example of the "quintessential employee beef: management has acted incompetently." *See Barnes v. McDowell*, 848 F.2d 725 (6th Cir. 1988). Further, Plaintiffs were speaking in their capacities as the Police Chief and Assistant Police Chief when they protested the new schedule and oversight policies. *See Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364 (6th Cir. 2007) (holding that a police officer's protests to his Chief against training cutbacks were made pursuant to official duties); *see also* [Doc. 30, Ex. 15] ("Chief of Police … shall provide advice to the Board of Mayor and Alderman and governing body on matters pertaining to the Police Department."). As the Court has determined that Plaintiffs' speech was not constitutionally protected, summary judgment is appropriate with no further inquiry. *Rahn*, 31 F.3d at 411 (6th Cir. 1994). Accordingly, Defendant's motion for Summary Judgment as to the First Amendment retaliation claim, Count 2, will be **GRANTED**.

### C. *Monell* Liability, Counts 3 and 4

To prevail on a claim against a municipality under § 1983, a plaintiff must establish both: (1) the deprivation of a constitutional right; and (2) the city's responsibility for that violation. *See Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2010) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). A city or municipality may only be held liable for the constitutional violations of its employees under 42 U.S.C. § 1983 if those actions are the result of a practice, policy, or custom of the municipality itself. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

As discussed above, the Court has determined that Defendant did not violate Plaintiffs' constitutional rights. The Sixth Circuit has recognized that "there can be no *Monell* liability without an underlying constitutional violation." *Robertson v. Lucas*, 753 F. 3d 606, 622 (2014); *see also Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000). Accordingly, Defendant's motion for summary judgment as to *Monell* liability, Counts 3 and 4, will be **GRANTED**.

### D. Tennessee State Law Claims: TPPA Claim and PEPFA Claim, Counts 5 and 6

The exercise of supplemental jurisdiction under 28 U.S.C. § 1367 is not mandatory, and a district court may decline to exercise that jurisdiction when it has dismissed all other claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). As the Court has granted summary judgment as to the federal claims, there remains no independent basis for federal jurisdiction. When "all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to

state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).

The Court declines to exercise jurisdiction over Plaintiffs' state law claims, and those claims, Counts 5 and 6, will be **DISMISSED without PREJUDICE to Plaintiffs refiling in state court**. *See* 28 U.S.C. § 1367(d).

## III. CONCLUSION

Accordingly, for the forgoing reasons, Defendant's motion for summary judgment [Doc. 24] will be **GRANTED** as to Counts 1 – 4, the Court will decline to exercise jurisdiction over Counts 5 – 6, and this action will be **DISMISSED.** An order consistent with this opinion will be entered.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge